**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| D.O., By and Through His Guardian Ad Litem Sonya Walker, *Plaintiff-Appellee,* <br><br> v. <br><br> ESCONDIDO UNION SCHOOL DISTRICT, *Defendant-Appellant.* | No. 21-55498 <br><br> D.C. No. 3:17-cv-02400-BEN-MDD <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted July 13, 2022
Pasadena, California

Filed January 31, 2023

Before: Mark J. Bennett and Gabriel P. Sanchez, Circuit
Judges, and Elizabeth E. Foote,* District Judge.

Opinion by Judge Bennett;
Partial Concurrence and Partial Dissent by Judge Sanchez

---

* The Honorable Elizabeth E. Foote, United States District Judge for the
Western District of Louisiana, sitting by designation.

# SUMMARY[**]

## Individuals with Disabilities Education Act

The panel reversed the district court's summary judgment in favor of student D.O. in his action under the Individuals with Disabilities Act against Escondido Union School District.

An administrative law judge ruled that Escondido's delay in assessing D.O. for autism was neither a procedural violation of the IDEA nor a denial of a free appropriate public education, or FAPE. The district court reversed the ALJ in part, holding that Escondido's four-month delay in assessing D.O. constituted a procedural violation of IDEA and that this procedural violation denied D.O. a FAPE by depriving him of educational benefits.

The panel held that it had jurisdiction because Escondido timely appealed the district court's final judgment, and there was no indication that the district court lacked jurisdiction.

Reviewing de novo, the panel reversed the district court's determination that Escondido's delay in proposing to assess D.O. was a procedural violation of IDEA. The panel concluded that Escondido's duty to propose an assessment in an area of suspected disability was triggered on December 5, 2016, when Escondido was put on notice that D.O. might be autistic by Dr. Margaret Dyson, who had completed an assessment and report. The panel concluded that Escondido's subsequent four-month delay in proposing an

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

autism assessment plan did not violate any California statutory deadlines or any federal statutory timeline. The panel held that Escondido's delay did not constitute a procedural violation of IDEA because Escondido did not fail to assess D.O., and some delay in complying with IDEA's procedural requirement is permissible. The panel held that the district court erred in determining that Escondido's delay was due, at least in part, to the subjective skepticism of its staff. Distinguishing *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105 (9th Cir. 2016), the panel concluded that Escondido staff's skepticism was based on substantial and scientific reasons. The panel held that the district court also erred in finding that Escondido's efforts to obtain Dr. Dyson's report from D.O.'s mother were "minimal," and Escondido properly pursued the report as useful to its own assessment.

The panel also held that even if the delay were a procedural violation of FAPE, it did not deny D.O. a FAPE. The panel concluded that Escondido's delay did not deprive D.O. of educational benefits, and D.O.'s individualized education program, or IEP, was reasonably calculated to provide D.O. educational benefits. Further, Escondido's delay did not deprive D.O. of educational opportunity, and it did not seriously infringe on D.O.'s mother's opportunity to participate in the IEP formulation process.

The panel held that the appeal was not moot, regardless of whether Escondido could recoup the $3,500 it paid to D.O. as reimbursement for an independent psychological evaluation.

The panel reversed the district court's judgment and remanded, directing the district court to enter judgment in accordance with this opinion.

Concurring in part and dissenting in part, Judge Sanchez concurred in the majority's holding that Escondido's delay in proposing to assess D.O. for autism did not deny him a FAPE. Judge Sanchez dissented, however, from the majority's conclusion that Escondido's failure to act for four months was nonetheless reasonable under the IDEA because D.O.'s mother was uncooperative. Judge Sanchez wrote that this court's precedent is clear that the school district has an independent legal obligation to promptly assess a child for a suspected disability, even when the parent does not cooperate in full or makes promises they do not keep. Judge Sanchez wrote that he would affirm the district court's determination that Escondido's four-month delay in initiating the process to assess D.O. for autism constituted a procedural violation of IDEA, and he would reverse its determination that this procedural violation resulted in the denial of a FAPE.

---

### COUNSEL

Deborah R.G. Cesario (argued) and Molly E. Thurmond, Hatch & Cesario, San Diego, California, for Defendants-Appellants.

Matthew H. Storey (argued) and Jennifer W. Holzman, Law Office of Matthew Storey APC, San Diego, California; David G. Greco, RMO LLP, Los Angeles, California, for Plaintiff-Appellee.

Summer D. Dalessandro and Tiffany M. Santos, Fagen Friedman & Fulfrost LLP, Carlsbad, California; Robert Tuerck and Michael Ambrose, California School Boards Association's Education Legal Alliance, West Sacramento, California; for Amicus Curiae California School Boards Association's Education Legal Alliance.

**OPINION**

BENNETT, Circuit Judge:

Escondido Union School District ("Escondido") appeals the district court's ruling that Escondido denied D.O. a Free Appropriate Public Education ("FAPE") by failing to timely assess him for autism.   On December 5, 2016, Dr. Margaret Dyson, an external clinical psychologist retained by D.O.'s mother, notified Escondido that she had completed an assessment of D.O. and, based on the assessment, D.O. appeared to meet the criteria for autism spectrum disorder. That day, Escondido asked D.O.'s mother to provide Dr. Dyson's report evaluating D.O. once she received it, which D.O.'s mother agreed to do.   Escondido needed to review the report before conducting its own assessment of D.O. for autism because certain tests for autism would return invalid results if administered more than once in a year.

Even though D.O.'s mother stated that she received the report "shortly after" December 5, 2016, she did not give the report to Escondido until July 5, 2017.   Counsel for D.O. and his mother conceded that Escondido had no way of getting Dr. Dyson's report without D.O.'s mother's consent. Transcript of Oral Argument at 14:15–14:52.   In April 2017, Escondido again requested a copy of Dr. Dyson's

report in a letter to counsel. Also in April 2017, D.O.'s mother filed a complaint alleging that Escondido's delay in assessing D.O. for autism was a procedural violation of the Individuals with Disabilities Education Act ("IDEA") and a denial of a FAPE. Escondido proposed to assess D.O. for autism in April 2017, but D.O.'s mother did not consent to an assessment until August 2017. Escondido's assessment completed in October 2017 found that D.O. did not qualify for special education for autism. D.O.'s mother did not dispute or challenge that determination.

In October 2017, an administrative law judge ("ALJ") ruled that Escondido's delay in assessing D.O. for autism was neither a procedural violation of IDEA nor a denial of a FAPE. The district court reversed the ALJ in part, holding that Escondido's four-month delay in assessing D.O. constituted a procedural violation of IDEA and that this procedural violation denied D.O. a FAPE by depriving him of educational benefits. We have jurisdiction under 28 U.S.C. § 1291 and reverse the district court's determination that Escondido's delay in proposing to assess D.O. was a procedural violation of IDEA that denied him a FAPE. We also hold that even if the delay were a procedural violation of IDEA, it did not deny D.O. a FAPE.

## I.  Facts and Proceedings Below

D.O. was born in 2007. D.O. has been educated in Escondido since "the summer before he started kindergarten" in September 2012 and has received special education services in the District ever since. IDEA requires local educational agencies to conduct an "initial evaluation . . . to determine whether a child . . . [has] a disability," 20 U.S.C. § 1414(a)(1)(C), "before the initial provision of special education and related services," *id.* §

1414(a)(1)(A).    After an initial evaluation, a "reevaluation . . . shall occur . . . not more frequently than once a year" and "at least once every 3 years."    *Id.* § 1414(a)(2)(B).    D.O.'s first evaluation in 2012 indicated he qualified for special education because of his attention deficit hyperactivity disorder.    No determination was made then that he qualified for special education for autism, and his mother never asked Escondido to make an autism determination until 2017.

D.O. demonstrated a need for, and accordingly received, substantial mental health services and behavioral intervention from Escondido, such as "daily classroom support and . . . individual and group counseling" from a mental health therapist, "a behavior support plan[] and . . . classroom-based behavioral intervention," as well as "specialized academic instruction" and "occupational therapy." [1]    D.O.'s 2015 reevaluation did not note

---

[1] The ALJ described the services that D.O. received from Escondido as follows:

> Through [Escondido]'s Intensive Behavior Intervention program at Miller Elementary, [D.O.] was frequently seen by two medical doctors who provided psychiatric assessment/diagnosis and medication prescription and monitoring. He was supported by a licensed marriage and family therapist who assessed and diagnosed him annually, and provided him mental health services daily.  He was supported by a rehabilitation/behavior therapist. A school psychologist conducted a triennial reevaluation, a functional behavior assessment, and an educationally related mental health assessment with social-emotional functioning assessment of [D.O.]  [D.O.] had special education and general education teachers observing him daily.  None of these professionals, in the four years they had been working with [D.O. up to

indications of autism.

D.O. also exhibited aggressive behavior, including yelling, screaming "verbal threats," and punching and kicking adults and peers. This aggressive behavior escalated in April 2016, when D.O. was eight years old, and he was hospitalized at Rady Children's Hospital for psychiatric issues, including verbal and physical aggression, property destruction, elopement, and hallucinations, in June and July 2016. Following hospitalization, D.O. was referred to therapy with Dr. Dyson, who worked at Rady. An unnamed person at the hospital, whom D.O.'s mother identified only as "the crisis lady who was working with [D.O.]," suggested to D.O.'s mother that D.O. may be autistic, and D.O.'s mother asked Dr. Dyson to assess him for autism. Nothing in the record suggests that D.O.'s mother or anyone else contemporaneously told Escondido about the autism assessment request.

By May 2016, D.O. was also experiencing symptoms of psychosis, including paranoia and hallucinations, and was taking medication to control such symptoms. A functional behavior assessment report providing examples of these symptoms was submitted to Escondido.

D.O.'s escalating aggression caused Escondido to conduct an Educationally Related Mental Health Services ("ERMHS") assessment in October 2016. As part of the assessment, Dr. Dyson reported to Escondido staff that D.O. "presents with unspecified psychosis and Disruptive Mood Dysregulation Disorder," but "Dr. Dyson did not mention . . . any suspicion she had that [D.O.] might have autism, any

---

December 5, 2016], . . . had any suspicion that he might have had autism.

concern expressed to her that [he] might have autism, or that she was evaluating or had been asked to evaluate [him] for possible autism." Escondido staff members who provided D.O. with various services testified before the ALJ that the symptoms that D.O. exhibited at this time were inconsistent with an autism diagnosis. Salvatore D'Amico, the school psychologist responsible for assessing D.O., testified that D.O.'s symptoms "look[] more like a mood disorder, rather than an autism spectrum disorder." D'Amico was present in D.O.'s classroom "at least two times a month" in the 2015–2016 school year and "three times a month" in the 2016–2017 school year. Rania Garva was a mental health therapist at Escondido who "interacted almost daily" with D.O. and provided "daily classroom support and weekly or bi-weekly individual and group counseling" to him. Garva, who was qualified to diagnose "individuals with a mood disorder" as well as "individuals with autism," testified that she disagreed with an autism diagnosis for D.O. because his behavior, including "physical assault, stealing, [and] reckless behavior" was "not consistent with . . . a child that is on the autism spectrum." Garva diagnosed D.O. with Bipolar I disorder under the DSM IV and testified that the diagnosis would not have changed under the DSM V.[2] Escondido did not consult Dr. Dyson regarding D.O. before the 2016 ERMHS assessment.

---

[2] Relying on the same testimony, the ALJ found that "[n]one of the educational, mental health, behavioral health, or medical professionals who had worked with [D.O.] through [Escondido] had observed in [D.O.] characteristics or symptoms of autism, and none suspected autism as an area of disability for [D.O.]" The ALJ specifically cited certain symptoms inconsistent with autism. For example, "[w]hen [D.O.] demonstrated typical behavior and social interaction, such as in his general education math class, he was entirely appropriate."

On December 5, 2016, D.O.'s IEP team met to review the results of the ERMHS assessment. The parties disputed some of what was said during that meeting, but the ALJ found that Dr. Dyson informed Escondido that "she had completed an assessment and based on the assessment, [D.O.] appeared to meet criteria for Autism Spectrum Disorder." At the meeting, Tracy Lane, an Escondido staff member, asked D.O.'s mother "for [Dr. Dyson's] report to be provided to [Lane] once . . . available." D.O.'s mother conceded that she "w[as] to provide a copy to [Escondido]." Dr. Dyson's report recommended that "[D.O.'s] treatment be modified to include interventions related to [autism]," and encouraged D.O.'s mother "to share these results with . . . [D.O.'s] school and IEP team."[3] Even though Dr. Dyson's report is dated December 5, 2016, and D.O.'s mother conceded that she received it "shortly after" the IEP meeting on that day, D.O.'s mother did not give the report to Escondido until July 5, 2017. When asked why she did not "share this report to anyone from Escondido once it was made available to [her]," D.O.'s mother said, "I'm not sure."

On March 28, 2017, D.O.'s mother filed an IDEA due process complaint against Escondido with California's Office of Administrative Hearings ("OAH"). The complaint alleged that D.O. had autism and that Escondido failed "to timely assess [D.O.] in all areas of suspected disability" but it did not specifically claim that Escondido failed to assess D.O. for autism. On April 7, 2017,

---

[3] Dr. Dyson's report was not addressed to Escondido. The report indicates that neither Dr. Dyson nor the children's hospital where D.O. was hospitalized ever sent the report to Escondido directly because the report encourages "[D.O.'s mother] to share these results with [his] school and IEP team."

Escondido responded to the complaint and also sent the attorney for D.O. and his mother a proposed autism assessment plan. D.O.'s mother did not consent to the proposed assessment plan. The same day, Escondido wrote to the attorney for D.O. and his mother, "renew[ing] its request for a copy of [Dr. Dyson's] report" and stating that "[u]pon receipt [Dr. Dyson's report] will be considered at an IEP team meeting."

On April 20, 2017, D.O. amended his complaint to also allege that Escondido denied him a FAPE by failing to timely assess him for autism. Before April 20, 2017, no one had asked Escondido to assess D.O. for autism. Escondido again sent D.O.'s mother a proposed autism assessment plan on August 23, 2017, which she consented to on that day. Escondido's October 2017 assessment of D.O. found that he did not qualify for special education for autism and left D.O.'s special education placement the same as it was before the assessment. D.O.'s mother did not dispute or challenge these determinations. On October 10, 2017, the ALJ denied relief on all claims.

There are two issues before us on appeal. The first is whether any delay in proposing the autism assessment constituted a procedural violation of IDEA. The second is, if there was such a procedural violation, whether Escondido denied D.O. "a FAPE for the 2016-2017 school year by failing to timely assess [him] . . . for autism following the December 5, 2016 IEP team meeting[,]" which both the ALJ and the district court referred to as Issue 3b. On Issue 3b, the ALJ found that Escondido's duty to assess D.O. for autism was triggered on December 5, 2016 because Dr. Dyson's statements in the IEP meeting on that day put Escondido on notice that D.O. was suspected of autism. But the ALJ found that the four-month delay between

December 5, 2016 and April 7, 2017 (when Escondido proposed an assessment for autism) did not violate IDEA. The ALJ found that D.O.'s mother never requested an assessment for autism, failed to provide Dr. Dyson's report to Escondido until July 2017, and failed to explain the delay, even though Escondido "wanted to see Dr. Dyson's report to know which testing instruments she had used, to be sure to . . . not inappropriately readminister the same instruments and obtain invalid results."    Escondido's request for Dr. Dyson's report is relevant because, as the ALJ found, "assessment instruments [for autism spectrum disorder] restricted how frequently any particular assessment could be re-administered to a person and still be considered valid and reliable.    [Escondido] was waiting to see Dr. Dyson's report before presenting [D.O.'s mother] with an assessment plan so [Escondido] would not improperly assess [D.O.] by reusing the same instruments."    The district court also found that Escondido "wanted to review Dr. Dyson's report . . . to identify the specific tests she used because assessors cannot give certain tests more than once within a year."    As stated above, counsel for D.O. and his mother conceded that Escondido had no way of getting Dr. Dyson's report without D.O.'s mother's consent.    Transcript of Oral Argument at 14:15–14:52.

The ALJ also found that "the four month delay . . . was not unreasonable," citing *Tamalpais Union High School District v. D.W.*, 271 F. Supp. 3d 1152 (N.D. Cal. 2017).    In *Tamalpais*, an assessment in June 2014 "reflected that D.W. struggled with defiance/aggression, hyperactivity, learning, executive function, inattention, and social relations."    *Id*. at 1156.    The student was assessed again in May 2015, but that assessment failed to assess the student's mental health. *Id*. at 1158.    In the ALJ's view, *Tamalpais* held that the

June 2014 assessment put the school district "on notice that it should have at least conducted a mental health evaluation the following year." *Id*. at 1159.   Citing *Tamalpais*, the ALJ held that "[w]hen a delay of up to one year in . . . [assessing] a suspected area of disability can be deemed acceptable, the four-month delay in this case cannot be said to have resulted in a denial of FAPE to [D.O.]"   Thus, the ALJ found that Escondido's "failure to provide . . . an assessment plan until April 7, 2017, was not a procedural violation of the IDEA."

The ALJ also held that "[e]ven if [D.O.] had proved a procedural violation, [he] failed to demonstrate how [Escondido's delay] . . . until April 7, 2017 denied [him] a FAPE."   D.O. "did not establish . . . how his educational program should have been different if he had autism." Escondido also did not significantly impede D.O.'s mother's participation in educational decision making because she "had the information in Dr. Dyson's report regarding any educational implications of Dr. Dyson's diagnosis, and she had the ability to advocate for [D.O.]'s education based on the information in Dr. Dyson's report," and D.O.'s mother "did not consent to [the proposed April 2017] assessment [plan] until over four months later."   "If [D.O.'s mother] was impeded in her ability to participate in educational decision-making, it was due to her own delay."

D.O. appealed the ALJ's order on November 29, 2017. On such an appeal, the district court may take the testimony of witnesses and make factual findings based on credibility. *See Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993) ("[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of

review.") (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988) ("[T]he district court's authority under § 1415(e) to supplement the record below with new evidence . . . plainly suggests less deference than is conventional [in the review of agency actions.]")).   Here, the district court did not take the testimony of any witnesses.

On December 18, 2018, the district court affirmed the ALJ in part and reversed in part.   Issue 1 concerned whether Escondido denied D.O. a FAPE by convening a meeting of the IEP team on April 15, 2016, a week after Escondido's behavior emergency intervention against D.O. on April 8, 2016, instead of within two days of the intervention.   Issue 2 concerned whether Escondido denied D.O. a FAPE by failing to determine the necessity for an interim behavior intervention plan and/or document the reasons for not developing an interim behavior intervention plan at the April 15, 2016 IEP meeting.   Issue 3a concerned whether Escondido denied D.O. a FAPE by failing to timely conduct the ERMHS assessment, and Issue 3b concerned whether Escondido denied D.O. a FAPE by failing to timely assess him for autism.   The district court noted that D.O.'s amended complaint sought to reverse the ALJ on all issues, but that the parties had jointly dismissed Issue 3a, and D.O. moved for summary judgment only on Issues 2 and 3b. The district court did not discuss Issue 1.   The district court denied relief on Issue 2, affirming the ALJ's reasoning and conclusion.

The district court reversed the ALJ solely on Issue 3b. The district court held that the delay between December 5, 2016 and April 7, 2017 was a procedural violation of IDEA because, while Escondido "was reasonable in waiting *some* period of time for Dr. Dyson's report before assessing D.O., a four-month wait . . . is not reasonable."   The court held

that Escondido's "delay was due, at least in part, to the skepticism of its staff," citing testimony indicating "their disagreement with Dr. Dyson's autism diagnosis based on their own day-to-day observations of D.O.'s behavior." Escondido "was obligated to assess D.O. for autism, *regardless* of the subjective views of its staff members concerning the likely outcome of such an assessment."

In determining that the four-month delay was unreasonable, the district court rejected Escondido's argument "that D.O.'s mother failed to offer [Dr. Dyson's] report to [Escondido] and waited . . . four months to consent to the assessment," holding that "the onus is on [Escondido], not the parent, to assess children in all areas of a suspected disability" and that Escondido had made only "minimal attempts to obtain the report."   The district court also dismissed the fact that no one asked Escondido to assess D.O. for autism until April 2017, stating that "the timing suggests that it was D.O.'s complaint that spurred [Escondido] into action, leading [Escondido] to propose an autism assessment after dragging its heels for four months." The district court thus held that the four-month delay was a procedural violation of IDEA.

The district court held that this procedural violation deprived D.O. of a FAPE.   "D.O.'s IEP goals were likely inappropriate because they were made without sufficient evaluative information about his individual capabilities as a potentially autistic child."   The district court quoted *Timothy O. v. Paso Robles Unified School District*, 822 F.3d 1105, 1126 (9th Cir. 2016), which held that "the failure to obtain critical and statutorily mandated medical information about an autistic child and about his particular educational needs renders the accomplishment of the IDEA's goals— and the achievement of a FAPE—*impossible*." (cleaned up).

The district court held that "because [Escondido] waited approximately four[]months to begin the process of obtaining information that might reflect on autism diagnosis and D.O.'s resulting differing needs, it was 'impossible' for [Escondido] to provide a FAPE to D.O." The district court remanded the case to the ALJ without instructions, staying further proceedings.

On remand, the ALJ "interpreted the remand as for the purpose of determining what remedy was appropriate" for the Issue 3b FAPE denial, and, on August 13, 2019, awarded D.O. reimbursement of the $3,500 that his mother spent on an independent psychological evaluation of D.O. Escondido appealed the district court's December 18, 2018 order on September 5, 2019, arguing that the ALJ's August 2019 decision converted the district court's December 18, 2018 order into a final decision. A panel of this Court dismissed that appeal for lack of jurisdiction under 28 U.S.C. § 1291, holding that "[t]he OAH decision does not by itself automatically create a final judgment in the district court; rather, the parties must return to that court so that it will 'have before it all the issues that are necessary for it to render a final judgment.'" On May 6, 2021, the district court affirmed the ALJ's August 2019 order awarding D.O. $3,500 and issued its final ruling holding that Escondido denied D.O. a FAPE by failing to timely assess him. The district court affirmed the ALJ on all other issues. These rulings were embodied in Findings of Fact, Conclusions of Law, and Final Judgment ("Final Judgment") entered on May 6, 2021. Escondido timely appealed on May 14, 2021.

## II.   Standard of Review

"We review the district court's findings of fact for clear error even when they are based on the written record of

administrative proceedings." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). A factual finding is "clearly erroneous when . . . the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983). We review questions of law de novo. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). "The grant or denial of summary judgment is a conclusion of law, reviewed *de novo*." *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 802 (9th Cir. 2008). We review mixed questions of law and fact de novo unless the mixed question is primarily factual. *Amanda J.*, 267 F.3d at 888. We face two issues on appeal: whether Escondido's four-month delay in assessing D.O. for autism constituted a procedural violation of IDEA and, if the delay amounted to such a violation, whether that violation denied D.O. a FAPE.

We review both issues de novo. In *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Off. of Admin. Hearings*, 758 F.3d 1162 (9th Cir. 2014) (hereinafter *E.M. II*), as in this case, the student alleged that the school district denied him a FAPE in violation of IDEA by "fail[ing] to assess [him] in all areas of suspected disability." *Id*. at 1178. The student challenged, among other things, the school district's finding that his central auditory processing disorder did not qualify him for special education under the "other health impairment" category. *Id*. at 1170. That challenge presented a mixed question of fact and law because it concerned whether the student suffered from a central auditory processing disorder, a question of fact, and whether a central auditory processing disorder is an "other health impairment" under federal and state regulations, a question of law. *See E.M. ex rel. E.M. v. Pajaro Valley Unified Sch.*

*Dist. Off. of Admin. Hearings*, 652 F.3d 999, 1003 (9th Cir. 2011) (hereinafter *E.M. I*) ("E.M. argues that the district court improperly concluded that he failed to establish that he suffered from a 'disorder in a basic psychological process.' We agree.   The only person who formally assessed E.M. . . . . diagnosed E.M. with an auditory processing disorder."); *E.M. II*, 758 F.3d at 1165 ("the district court . . . ruled that E.M.'s central auditory processing disorder could not be considered an 'other health impairment' under the applicable federal and state regulations.") (citing 34 C.F.R. § 300.7(c)(9) (2005); Cal. Code Regs. Tit. 5, § 3030(f) (2005)).     Despite recognizing the deference due to the factual findings made below, we still applied de novo review in both *E.M. I* and *E.M. II*.   *E.M. I*, 652 F.3d at 1002 (de novo review); *E.M. II*, 758 F.3d at 1170 ("We . . . review de novo the district court's decision that the school district complied with the IDEA." (internal quotations and citation omitted)); *id*. ("Our opinion [in *E.M. I*] did not alter the standard of review [for *E.M. II*].").

*E.M.* indicates that de novo review applies to whether Escondido's delay in assessing D.O. for autism constituted a procedural violation of IDEA.   Whether the four-month delay in assessment is a procedural violation is a mixed question of fact and law because it requires us to determine why the delay occurred (a question of fact) and whether such a delay violated IDEA (a question of law).   But the factual part of this mixed question is far smaller than the legal part because the core of the facts material to why Escondido's delay occurred are undisputed.   Escondido "wanted to see Dr. Dyson's report to know which testing instruments she had used, to be sure to . . . not inappropriately readminister the same instruments and obtain invalid results."   D.O.'s mother was "not sure" as to why she did not give Dr.

Dyson's report to Escondido until July 2017 despite receiving it "shortly after" December 5, 2016. Escondido "renew[ed] its request for a copy of [Dr. Dyson's] report" and stated in a letter to the attorney for D.O. and his mother that "[u]pon receipt" of the report, it would be considered at an IEP team meeting. The remaining questions of fact related to this issue are minor. This is especially so when compared to *E.M.*, which presented a much more significant material factual dispute over whether the child suffered from the alleged disability. We still applied de novo review as to whether the school district in that case violated IDEA. *E.M. I*, 652 F.3d at 1002; *E.M. II*, 758 F.3d at 1170.

The cases in which we did review mixed questions of fact and law for clear error also indicate that de novo review should apply here. In *Gregory K.*, the school district "challenge[d] the trial court's ruling that 'Gregory K. has a learning disability' and 'is not mentally retarded,'" which we held was "a mixed question of law and fact." 811 F.2d at 1311. We considered, among other things, the student's intellectual functioning ("IQ") range, expert testimony about the student's intellectual functioning, and whether the student's intellectual functioning met the eligibility criteria for "mild mental retardation" under Wash. Ann. Code 392-171-421(2)(a) (1983). 811 F.2d at 1311–12. We held that "[w]e are 'left with the definite and firm conviction' that the trial court erred in its weighing of the evidence regarding [the student's] IQ testing" and that the student's "eligibility for special education was correctly based on mild mental retardation." *Id*. at 1312. In *R.B. ex rel. F.B. v. Napa Valley Unified School District*, 496 F.3d 932 (9th Cir. 2007), where we expressly held that the mixed question of law and fact presented was "primarily factual," *id*. at 937, a central issue was whether the student "did not qualify as a 'child

with a disability' because she did not meet any of the criteria for 'a severe emotional disturbance.'"   *Id.* at 947.

Unlike in *Gregory K.* and *R.B.*, whether D.O. is autistic and whether Escondido's special education placement for D.O. was appropriate are not at issue here.   D.O. never disputed the results of Escondido's October 2017 autism assessment, which found that D.O. did not qualify for special education for autism and thus left his special education placement unchanged.   D.O. also conceded that "it is possible for a student with a diagnosed disability to still not qualify for special education [for that disability]."[4]   The issue is whether Escondido's delay in proposing to assess D.O. for autism was a procedural violation of IDEA and whether such a violation, if it occurred, denied D.O. a FAPE.

Another issue relevant to the scope of review concerns the fact that D.O. did not cross-appeal.   Because D.O. is not seeking more relief than what the district court already granted, D.O. may argue and we may reach "any ground supported by the record."   *United States v. Hilger*, 867 F.2d 566, 567 (9th Cir. 1989) (citation omitted).   "Generally, 'a cross-appeal is required to support modification of the judgment, but . . . arguments that support the judgment as

---

[4]  D.O. attempts to present a factual dispute as to whether he has autism. D.O. argues that "Escondido incorrectly tells this court that D.O. does not have autism," quoting a sentence in Escondido's brief that "[t]he suspicion of autism proved unfounded."   D.O. is mischaracterizing Escondido's statement because the context of that sentence is that "the IEP team, including D.O.'s mother, concluded that he did not qualify for special education under the autism category," not that D.O. was incorrectly diagnosed with autism.   But regardless, the issue here is whether Escondido's delay in *proposing to assess* D.O. for autism denied him a FAPE.   Moreover, neither the ALJ nor the district court made a factual finding as to whether D.O. was autistic.

entered can be made without a cross-appeal.'    A cross-appeal is unnecessary even where the argument being raised has been explicitly rejected by the district court." *Engleson v. Burlington N. R. Co.*, 972 F.2d 1038, 1041 (9th Cir. 1992) (citations omitted).

## III.   Analysis

### A.   Appellate Jurisdiction

D.O. argues that we lack appellate jurisdiction for two reasons.    First, D.O. cites Escondido's failure to appeal within 90 days the ALJ's August 13, 2019 order on remand. *See* 20 U.S.C. § 1415(i)(2).    This claim is unpersuasive because Escondido timely appealed the district court's May 6, 2021 Final Judgment, which was partly in favor of D.O., and D.O. does not show how Escondido's failure to appeal from the ALJ's August 13, 2019 order on remand deprives us of jurisdiction over Escondido's timely appeal. Escondido appealed from the Final Judgment on May 14, 2021.    "[T]he notice of appeal . . . must be filed . . . within 30 days after entry of the judgment . . . appealed from." Fed. R. App. P. 4(a)(1)(A).    "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."    28 U.S.C. § 1291. We would lack jurisdiction over this appeal if the district court lacked jurisdiction.    *See California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1009 (9th Cir. 2000) ("An appellate court is under a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.") (internal quotations and citations omitted).    But there is no indication that the district court lacked jurisdiction, and neither party has so argued.

Second, D.O. cites the fact that Escondido unsuccessfully appealed the district court's December 2018 order before appealing the Final Judgment. D.O. argues that because that panel "dismissed the First Appeal for lack of jurisdiction, there is no second bite at the apple." This claim lacks merit because, as discussed, Escondido timely appealed from the Final Judgment.**[5]**

## B.  Reviewing de novo, Escondido's delay until April 7, 2017 in proposing an autism assessment plan did not amount to a procedural violation of IDEA

### 1. Escondido's duty to propose an assessment triggered on December 5, 2016

"A child must be tested in all areas of suspected disability." *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cnty., Mont.*, 541 F.3d 1202, 1208 (9th Cir. 2008) (citing 20 U.S.C. § 1414(b)). In *N.B.*, the child was diagnosed with autism by an expert outside the school district. *Id*. at 1205. The "parents discussed [the outside expert's report] with [the school district's] special education director in August 2003," and the school district's staff reviewed that report in September 2003. *Id*. at 1209. We thus held that the school district was "on notice that [the child] likely suffered from some form of autism" "[a]s of September 2003," citing both the fact that the parents discussed the report with the district's staff in August and the fact that the staff read the report in September. *Id*.

---

[5] D.O. does not argue that the district court's December 2018 order was an immediately appealable collateral order. D.O. could not make such an argument, given that another panel of the Ninth Circuit dismissed Escondido's appeal of the December 2018 order for lack of jurisdiction.

In *Timothy O.*, 822 F.3d at 1105, a psychologist outside the school district provisionally diagnosed the child with autism and sent the district a report "two days before the initial IEP meeting."   *Id*. at 1115.   We held that "even if [the district] had not had notice of [the child's] autistic symptoms at the time of the . . . initial assessment, it obtained such notice when it received the [report diagnosing autism]." *Id*. at 1121.   In *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir. 1996), the agency refused to assess a child who was diagnosed with "a potentially disabling condition." *Id*. at 800.   We held that "informed suspicions of parents, who may have consulted outside experts, should trigger the statutory protections."   *Id*. at 802.

Escondido was put on notice that D.O. may be autistic, and thus that it had a duty to assess him, on December 5, 2016.   The ALJ found that Dr. Dyson stated at a meeting of D.O.'s IEP team on that day that she had completed her assessment, and D.O. met the diagnostic criteria for autism spectrum disorder.   Escondido concedes that Dr. Dyson began that evaluation at D.O.'s mother's request.   As we have held, notice of the "informed suspicion[] of parents, who may have consulted outside experts" triggers the duty to assess.   *Id.*   That principle applies to an even greater extent here, where there was an actual statement that D.O. met the criteria for autism spectrum disorder from the expert whom the parent consulted, made in the presence of the parent and the IEP team.   Although D.O.'s mother failed to give Escondido Dr. Dyson's December 5, 2016 *written* report diagnosing D.O. with autism until July 2017, Dr. Dyson's verbal statement on December 5, 2016 was enough to put Escondido on notice of its duty to assess.   *See N.B.*, 541 F.3d at 1209 (school district was on notice after the parents discussed an outside report diagnosing their child

with autism with district staff).    Thus, Escondido's duty to propose an assessment triggered on December 5, 2016.

2.    Escondido's delay did not violate any statutory deadlines or timelines

"Procedural compliance is essential to ensuring that every eligible child receives a FAPE . . . ."    *Amanda J.*, 267 F.3d at 891.    "[A] school district must comply not only with federal statutory and regulatory procedures, but with state regulations as well: 'State standards that are not inconsistent with federal standards [under the IDEA] are also enforceable in federal court.'"    *N.B.*, 541 F.3d at 1208 (second alteration in original) (quoting *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir.1992) (superseded by statute in part on other grounds)).

As discussed above, D.O. claimed that he was denied a FAPE because Escondido convened a meeting of the IEP team on April 15, 2016, a week after Escondido's behavior emergency intervention against D.O. on April 8, 2016, instead of within two days of the intervention.    D.O. also argued that Escondido denied him a FAPE by failing to determine the necessity for an interim behavior intervention plan and/or document the reasons for not developing an interim behavior intervention plan at the April 15, 2016 IEP meeting.    The district court did not discuss the first claim but rejected the second.

As to the issue before us, D.O. argues that Escondido's proposal of an assessment plan on April 7, 2017 violated state law because Escondido had a "duty within 15 days [of December 5, 2016] to offer D.O.'s [m]other an assessment plan[] [for autism] under IDEA and state law," and "California Education Code [§] 56043(a) gives [Escondido] 15[]days to provide an assessment plan."    The district court

also cited § 56043(a) in ruling that Escondido's "four-month delay was unreasonable under the circumstances, constituting a procedural violation."

Escondido's four-month delay did not violate any California statutory deadlines. D.O.'s characterization of § 56043(a) is incorrect because § 56043(a) states that "[a] proposed assessment plan shall be developed within 15 calendar days of *referral for assessment.*" *Id.* (emphasis added). Cal. Educ. Code § 56029 defines "[r]eferral for assessment" as "any *written request* for assessment" made by a parent, guardian, teacher, or "other service provider of the individual." *Id.* (emphasis added). As discussed, it is undisputed that no one gave Escondido a written request for an autism assessment before April 20, 2017, [6] and Escondido proposed an autism assessment plan on April 7, 2017, when it responded to D.O.'s complaint. Thus, Escondido's proposal of an autism assessment plan on April 7, 2017 did not violate § 56043.

Escondido also did not violate any federal statutory timeline. The assessment that D.O. claims Escondido failed to timely provide is a reevaluation because Escondido assessed D.O. initially in 2012 to determine his eligibility for special education. Federal law requires a reevaluation "if the local educational agency determines that the . . . needs .

---

[6] Dr. Dyson's report may constitute such a "written request for assessment" because Dr. Dyson was arguably a "service provider" under § 56029 and her report recommended that "[D.O.'s] treatment be modified to include interventions related to [autism]" and encouraged D.O.'s mother "to share these results with . . . [D.O.'s] IEP team." But even if Dr. Dyson's report constitutes a "written request for assessment" under section 56029, D.O.'s mother did not give the report to Escondido until July 5, 2017.

. . of the child warrant a reevaluation" or "if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2)(A). "A reevaluation . . . shall occur . . . not more frequently than once a year, unless the parent and the local educational agency agree otherwise" and "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." *Id.* § 1414(a)(2)(B).

Escondido did not violate § 1414(a)(2)(A) or § 1414(a)(2)(B). Despite § 1414(a)(2)(A)(ii)'s requirement that a reevaluation be made "if the child's parents . . . request[]" one, no one acting on D.O.'s behalf requested a reevaluation for autism before April 20, 2017. Consistent with § 1414(a)(2)(A)(i)'s requirement that a reevaluation be made if the school deems it necessary, Escondido reevaluated D.O. in 2016 due to "the need to gather additional information regarding [his] social, emotional, and behavioral functioning . . . ." The timing of Escondido's evaluations complied with § 1414(a)(2)(B), which states that a reevaluation shall occur no more often than once a year but no less often than once every three years.

Thus, Escondido's delay in proposing an autism assessment plan did not violate any state or federal statutory deadline or timeline.

### 3.   Escondido's delay did not constitute a procedural violation of IDEA

A delay in proposing an autism assessment plan does not by itself constitute a procedural violation of IDEA. First, a *failure* to assess a child for a suspected disability does constitute such a violation. *See Timothy O.*, 822 F.3d at 1118 (school district "failed to formally assess [the child] for autism"); *N.B.*, 541 F.3d at 1205 (school district "failed to

meet its procedural obligation under the IDEA to evaluate [the child] to determine whether he was autistic."). But second, some delay in complying with IDEA's procedural requirements is permissible. *See, e.g.*, *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 779 (9th Cir. 2010) (holding that school district "did not hold an IEP [meeting] within thirty days" of child's enrollment as required by Cal. Educ. Code § 56325(a)(1), but that a two-week "brief delay during winter vacation" did not procedurally violate IDEA). Thus, when faced with a delay in proposing an assessment plan, we must decide whether the delay equaled a procedural violation. *See JG*, 552 F.3d at 798 ("We hold that Nevada's forty-five-school-day timeline is not an inconsistent interpretation of IDEA's reasonable timeliness requirement.").

The district court erred in holding that Escondido's four-month delay was a procedural violation of IDEA. The district court found that Escondido's "delay was due, at least in part, to the skepticism of its staff," citing "their disagreement with Dr. Dyson's autism diagnosis based on their own day-to-day observations of D.O.'s behavior." The court then held that Escondido "was obligated to assess D.O. for autism, regardless of the subjective views of its staff members concerning the likely outcome of such an assessment," quoting our statement in *Timothy O.* that "[s]chool districts cannot circumvent th[e] responsibility [to assess for suspected disability] by way of informal observations, nor can the subjective opinion of a staff member dispel such reported suspicion." 822 F.3d at 1119.

These observations/determinations by the district court are materially incorrect, whether we review them de novo or

for clear error.[7]    The district court's reliance on *Timothy O.* was erroneous because *Timothy O.* is inapt.    In *Timothy O.*, "[a]t the time of [the child's] initial evaluation, [the school district] was aware that [the child] displayed signs of autistic behavior" because the district had sent one of its psychologists to observe the child "to advise [the district's] staff whether it needed to conduct a full and formal test for autism."    *Id.* at 1109, 1114.    But the psychologist dismissed the possibility of autism after only "an informal, unscientific observation of the child" that lasted for only "thirty to forty minutes."    *Id*.    In contrast, Escondido's skepticism that D.O. was autistic was far from "the informal observations" or "the subjective opinion of a staff member" that *Timothy O.* rejected.    *Id*. at 1119.    For one thing, Escondido had educated D.O. since "the summer before he started kindergarten" in 2012 and provided substantial mental health services to him for "five years, working with him very closely" as of 2017.    And as discussed above, Staff who expressed skepticism that D.O. was autistic included Rania Garva, who had served as D.O.'s mental health therapist since 2012.    Garva interacted with D.O. daily, had diagnosed him with bipolar I, and was qualified to diagnose him with autism.    Garva testified that D.O.'s behavior, which included "physical assault, stealing, [and] reckless behavior," was "not consistent with . . . a child that is on the autism spectrum."    Likewise, Salvatore D'Amico, the school psychologist responsible for assessing D.O., and who had regularly assessed him for several years, provided

---

[7] And as discussed above, we here review de novo the bottom-line determination that there was a procedural violation of IDEA.    *See E.M. II*, 758 F.3d at 1170 (We "review de novo the district court's decision that the school district complied with the IDEA." (internal quotations and citation omitted)).

detailed testimony supporting his mood disorder, not autism spectrum disorder, opinion.

Indeed, D.O.'s education through the District's Intensive Behavioral Intervention program also involved two medical doctors who provided psychiatric assessment and medication monitoring; a rehabilitation/behavior therapist; D.O.'s special education teachers; and D.O.'s general education teachers.   All these professionals had years of experience with D.O.   As the ALJ found: "None of these professionals, in the four years they had been working with [D.O.], believed he presented as a student with autism or had any suspicion that he might have had autism."

For good reason.   As the ALJ found, Dr. Dyson reported to Escondido staff during the October 2016 ERMHS assessment that D.O. "was able to verbalize social and emotional strategies to deal with challenging behavior and social situations in a clinical setting when not in distress."   Such fluctuating behavior, according to Escondido staff who worked closely with D.O., was inconsistent with an autism diagnosis.   Dr. Dyson also "did not mention to Mr. D'Amico any suspicion she had that [D.O.] might have autism, any concern expressed to her that [D.O.] might have autism, or that she was evaluating or had been asked to evaluate [D.O.] for possible autism."

Considering these circumstances, Escondido staff's skepticism of Dr. Dyson's diagnosis was based on reasons far more substantial and scientific than "informal observations" or "the subjective opinion of a staff member" in *Timothy O.*, 822 F.3d at 1119.   The school psychologist in *Timothy O.* "stopped by and observed [the child] for approximately thirty to forty minutes," *id*. at 1114, but

Escondido staff had provided substantial services to D.O. for years. For example, D.O. had a mental health therapist who "interacted almost daily" with D.O. and provided "daily classroom support and weekly or bi-weekly individual and group counseling" to him, for "five years." Thus, the district court's attribution of Escondido's delay in assessing D.O. to "the subjective views of its staff members," was erroneous, whether clear error or de novo review applies.

Critically, part of Escondido's delay was because it "was waiting to see Dr. Dyson's report before presenting [D.O.'s mother] with an assessment plan so [Escondido] would not improperly assess [D.O.] by reusing the same instruments."

> Due to the test-retest effect, publishers of assessment instruments restricted how frequently any particular assessment could be re-administered to a person and still be considered valid and reliable. District was waiting to see Dr. Dyson's report before presenting Mother with an assessment plan so District would not improperly assess Student by reusing the same instruments.

Without Dr. Dyson's report (or some other definitive description of the tests Dr. Dyson had used), Escondido could not appropriately conduct an autism assessment of D.O. and any assessment it conducted without Dr. Dyson's report might well have been invalid. But D.O.'s mother failed to provide the report to Escondido until July 2017 and failed to explain the delay during the administrative hearing (or to the district court). The district court also recognized the fact that Escondido "wanted to review Dr. Dyson's report

. . . to identify the specific tests she used because assessors cannot give certain tests more than once within a year."

Yet the district court dismissed this fact by finding that Escondido's "minimal attempts to obtain the report do not somehow justify a four-month delay, particularly when one of those attempts was made only after D.O. filed his due process complaint." Although the district court did not explain why Escondido's efforts to obtain Dr. Dyson's report from D.O.'s mother were "minimal," that finding was erroneous.[8] Escondido first asked D.O.'s mother for the report on December 5, 2016, when Dr. Dyson revealed to Escondido for the first time that she had evaluated D.O. for autism. Escondido could not have asked for the report any earlier because December 5, 2016 was when Escondido discovered that such a report existed. And D.O.'s mother agreed to provide the report. Escondido attempted to obtain the report again in April 2017 by sending a written

---

[8] The district court's statement that Escondido's efforts to obtain Dr. Dyson's report were "minimal" is better described as a characterization than as a factual finding, not least because the district court does not explain why Escondido's efforts were "minimal." We nevertheless describe this characterization as a finding following *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394 (1981). In that case, the district court stated that "respondents had attempted to avoid removal jurisdiction by 'artful[ly]' casting their 'essentially federal law claims' as state-law claims," and the Supreme Court held that it "will not question here that factual finding." *Id*. at 397 n.2. Dissenting, Justice Brennan stated that "this amounts to no more than a pejorative characterization," instead of a finding of fact. *Id*. at 409–10 (Brennan, J., dissenting). But here, regardless of whether the district court's statement is a factual finding or a mere characterization, that statement was erroneous.

request to the attorney for D.O. and his mother.**⁹**    Though, of course, Escondido could have made the second request earlier, the district court's finding that Escondido's multiple attempts to obtain Dr. Dyson's report were "minimal," was erroneous, whether clear error or de novo review applies.**¹⁰**

On this point, the dissent argues that D.O.'s mother's failure to provide Escondido with Dr. Dyson's report has no bearing on Escondido's independent duty under IDEA to assess D.O.    While parental recalcitrance does not strip a school district of its duty to assess children "using the comprehensive and reliable methods that [] IDEA requires," *Timothy O.*, 822 F.3d at 1121–22, neither does IDEA require school districts to prioritize speed over accuracy.

On December 5, 2016, Escondido became aware that D.O. had been evaluated for autism.    Rephrased, Escondido became aware that D.O. had taken a set of tests. According to the dissent, Escondido was legally required to conduct (or create a plan to conduct) its own set of autism assessment tests very shortly thereafter—even though Escondido did not know which tests D.O. had already taken, and even though to ensure accuracy, assessors "cannot give certain tests more than once within a year."    Indeed, if tests are duplicated "within a certain time frame," the tests can be considered "null and void."    The District and its mental health professionals, which had sound reasons, based on

---

⁹ Nothing in the record suggests Escondido knew D.O. or his mother had an attorney prior to March 28, 2017, when D.O. filed the original complaint.

¹⁰ Even if the April request had been made earlier, Dr. Dyson's report was not provided until July, and Escondido could not have appropriately performed an autism assessment until it had that report or a list of the tests Dr. Dyson had utilized in her assessment.

years of testing and observation, for believing D.O. did not have autism, acted reasonably by not precipitously scheduling or moving to schedule potentially invalid tests.

The dissent also faults Escondido for its insufficient doggedness in pursuing Dr. Dyson's report and, at the same time, dismisses the idea that the District was truly waiting for the Dyson report because it prepared the April 2017 assessment plan without the report in hand.    But the District renewed its request for the Dyson report in April.   As the ALJ noted, the April 4, 2017 assessment plan sent to D.O.'s mother "indicated the school staff was awaiting a copy" of Dr. Dyson's report "for review as part of the evaluation." Moreover, the District enclosed in the April 4, 2017 plan "a Student/Patient Release of Information form seeking authorization for Rady Children's Hospital to disclose" information including the Dr. Dyson report.   Escondido understood that best practices required Dr. Dyson's report be considered in crafting an autism assessment plan for D.O.

Moreover, no claim has been made that Escondido inappropriately delayed the assessment after receiving the consent to perform it from D.O.'s mother on August 23.[11] Unlike Escondido, which was merely delayed in assessing D.O., the school district in *Timothy O.* "deliberately refused" to assess a child for autism, 822 F.3d at 1122.   This fact materially distinguishes this case from *Timothy O.   See id.* ("[I]t is particularly egregious that in conducting [the child's] initial evaluation . . . [the school district] *deliberately refused* to include an assessment of the one suspected disability of which it had clear notice—autism."

---

[11]  "Determining whether a student has autism requires many assessments and takes a good deal of time."   *JG*, 552 F.3d at 791.

(emphasis added)).   Thus, the district court erred in not accounting for the many material differences between this case and *Timothy O.*

This case resembles *JG*, 552 F.3d 786, not *Timothy O.* *JG* involved, among other things, "the school district's delay in notifying the [children's] parents that it would evaluate [them] for disabilities."   *Id.* at 789.   The school district "was required to give . . . notice [to the parents] on May 7, 2003," but the district began evaluating the children without notifying the parents and gave notice only on August 15, 2003.   *Id*.   Ultimately this resulted in a delay of "110 calendar days and thirty-eight school days" between the date the District was required to give the children's parents a notice and consent form and the date the children began receiving services.   *Id*. at 798, 800.   We held that "[t]he 110-day delay was reasonable" because "[s]mall administrative delays, like this one, and especially delays needed to promote effective test results, should not render the [school district's] actions unreasonable."   *Id*. at 798; *see also id.* at 791 ("Determining whether a student has autism requires many assessments and takes a good deal of time."). We also held that school districts have "a degree of leeway during summer vacation," while excluding cases "where a school district simply delays in the face of a referral for a potentially autistic child solely because summer vacation makes a timely evaluation difficult."   *Id*. at 798.

*JG* is materially similar to this case.   As the approximate four-month delay in *JG* included a summer break, the four-month delay here included a two-week

winter break. **12**     As in *JG*, the delay here was due in nontrivial part to "delays needed to promote effective test results."     *Id.*     Indeed, as discussed above, without knowing the tests Dr. Dyson used, Escondido could not have performed the assessment accurately.     As the district court recognized, "[b]efore performing its own autism assessment of D.O., [Escondido] wanted to review Dr. Dyson's report . . . to identify the specific tests she used because assessors cannot give certain tests more than once within a year," and Escondido "attempted [a second time] to obtain the report by asking D.O.'s counsel for the report on April 7, 2017." Despite receiving the report "shortly after" the IEP meeting on December 5, 2016, D.O.'s mother gave the report to Escondido only on July 5, 2017.   And Escondido proposed an assessment for the first time on April 7, 2017, but D.O.'s mother did not consent to an assessment plan until August 23, 2017.

In sum, while Escondido was notified of facts on December 5, 2016 which triggered its duty to propose an autism assessment for D.O., Escondido's four-month delay in proposing an autism assessment did not amount to a procedural violation of IDEA.   Escondido did not violate any statutory deadline under state law, and the reasons for Escondido's delay are unlike the reasons for delay presented in cases in which we have found a procedural violation of IDEA.   Although we review whether Escondido's delay amounted to a procedural violation of IDEA de novo, *see E.M. II*, 758 F.3d at 1170, Escondido's delay did not amount

---

[12] Escondido's duty to assess triggered on December 5, 2016, and Escondido proposed a plan on April 7, 2017.   There are 123 calendar days between those two dates, and Escondido's academic calendar for that year shows that there were 73 school days between those dates.

to a procedural violation of IDEA whether de novo or clear error review applies.

## C.   Even if Escondido's four-month delay were a procedural violation of IDEA, any such violation did not deny D.O. a FAPE

### 1.   Escondido's delay did not deprive D.O. of educational benefits, and D.O.'s IEP was reasonably calculated to provide D.O. educational benefits

A procedural violation of IDEA constitutes a denial of FAPE if there are "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe [on] the parents' opportunity to participate in the IEP formulation process, or . . . cause[] a deprivation of educational benefits." *Amanda J.*, 267 F.3d at 892 (internal quotations and citation omitted).   If none of these elements exist, we "evaluate whether the IEP is reasonably calculated to enable the child to receive educational benefits."   *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1054 (9th Cir. 2012) (internal quotations and citation omitted).   The district court held that Escondido's four-month delay in proposing to assess D.O. denied him a FAPE "on the basis of the educational benefit ground," again relying on *Timothy O.*:

> [T]he Ninth Circuit has held that "[o]n more than one occasion . . . the failure to obtain critical and statutorily mandated medical information about an autistic child and about his particular educational needs renders the accomplishment of the IDEA's goals—and the achievement of a FAPE—*impossible*." [*Timothy O.*, 822 F.3d] at 1126 (emphasis in original).   Here, as in *Timothy O.*, D.O.'s

IEP goals were likely inappropriate because they were made without sufficient evaluative information about his individual capabilities as a potentially autistic child. *See id*. Accordingly, because the District waited approximately four[] months to begin the process of obtaining information that might reflect on autism diagnosis and D.O.'s resulting differing needs, it was "impossible" for the District to provide a FAPE to D.O. *See id*.

The district court's reliance on *Timothy O*. is erroneous because it ignores the fact that, in *Timothy O*., "it [wa]s particularly egregious that in conducting [the child's] initial evaluation which assessed him for other possible disorders, [the school district] deliberately refused to include an assessment of the one suspected disability of which it had clear notice—autism." 822 F.3d at 1122. As a result, the school district staff "treated [the child] as if he were selectively mute, which they certainly would not have done if they had an assessment for autism." *Id*. at 1125. Because the school district in *Timothy O*. refused to assess the child for autism, we held that "the failure to obtain critical and statutorily mandated medical information about an autistic child . . . renders the accomplishment of the IDEA's goals—and the achievement of a FAPE— *impossible*." *Id*. at 1126 (cleaned up). In contrast, Escondido proposed to assess D.O. for autism in April 2017 and assessed him for autism in October 2017, two months after obtaining parental consent. The district court erred in conflating the *refusal* to assess (and other egregious

behavior) in *Timothy O.* with Escondido's *delay* in assessment in the circumstances here.[13]

We reject D.O.'s argument that a delay in assessment is a per se denial of a FAPE, even if the delay does amount to a procedural violation of the IDEA. D.O. relies in part on *N.B.* which, according to D.O., held that a school district denied a student a FAPE because when it "suspected that a student had autism [it] merely referred parents to obtain an assessment from an outside agency, rather than the district assessing itself . . . ." But *N.B.* is distinguishable because a delay is different from the school district *failing* to assess a child and instead farming out the assessment to an outside entity. When, as here, the school district assessed after a delay, we must decide whether the delay deprived the child of an educational benefit. And we hold that the same is true even if the delay did amount to an IDEA procedural violation.

---

[13] Those circumstances are discussed above, but some bear repeating. The District had been providing special education services to D.O. for the entire time he had been in school—"five years" as of 2017. Those services consisted of, among others, "psychiatric assessment/diagnosis and medication prescription and monitoring," "mental health services daily," and "special education and general education teachers observing him daily." The first suggestion of autism was in a December 2016 meeting. Escondido's mental health professionals, including D'Amico and Garva, questioned autism because of possible behaviors by D.O. that they averred were clinically inconsistent with autism. An assessment for autism could not responsibly be done until the district knew what tests Dr. Dyson had used because certain standard tests could not be repeated until one year had passed from when Dr. Dyson had administered them. D.O.'s mother said she would provide Dr. Dyson's report and did not. Counsel for D.O. and his mother conceded at oral argument that "there are certain autism tests that can't be repeated" within 365 days because "the data from those [repeated] assessments wouldn't be valid." Transcript of Oral Argument at 24:18–24:40.

The relevant question is not merely whether the delay was too long, but whether the delay deprived the child of an educational benefit.

Here, even if Escondido's delay in proposing to assess D.O. were a procedural violation of IDEA, such a violation did not deny D.O. a FAPE because it did not deprive him of any educational benefit. "[D]elays in meeting IEP deadlines do not deny a student a FAPE where they do not deprive a student of any educational benefit." *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1046 (9th Cir. 2013) (citing *A.M.*, 627 F.3d at 779). Even though the school district in *A.M.* delayed in assessing the student's needs, we held that the delay "caused no educational deprivation to A.M. [a]s . . . evidenced by the fact that A.M.'s placement continued as [before] in May." 627 F.3d at 779. As in *A.M.*, Escondido's assessment of D.O. was delayed, but Escondido assessed D.O. for autism and maintained the same special education placement for D.O. as before the autism assessment.[14] In the circumstances here, because D.O.'s special education placement remained unchanged, Escondido's delay in that assessment did not deprive D.O. of educational benefits.[15] D.O.'s mother did not dispute the results of D.O.'s October 2017 autism assessment, and

---

[14] As noted, Escondido maintained the same special education placement without objection or challenge by D.O.'s mother.

[15] We are not called upon to decide whether under different circumstances there might be a FAPE denial because of, for example, a loss of educational benefits or a loss of an educational opportunity even if a placement remained unchanged after a delayed assessment. The questions we answer here are whether a delay (even an impermissible one) per se equals a FAPE denial—it does not; and whether the delay here denied D.O. a FAPE—it did not.

D.O. concedes that "it is possible for a student with a diagnosed disability to still not qualify for special education [for that disability]."

As to whether D.O.'s IEP was "reasonably calculated" to provide educational benefits, that requirement is met by providing an education that provides a student with a "meaningful benefit." *N.B.*, 541 F.3d at 1212–13. To meet this standard, a school district "must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). "[W]e must not critique an IEP with the benefit of hindsight . . . we evaluate whether the [IEP was] reasonably calculated to ensure that the child would receive educational benefits at the time of implementation." *Anchorage Sch. Dist.*, 689 F.3d at 1058. Escondido "provid[ed] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction," *Rowley*, 458 U.S. at 203. For five years as of 2017, "[D.O.] was frequently seen by two medical doctors who provided psychiatric assessment/diagnosis and medication prescription and monitoring. He was supported by a licensed marriage and family therapist who assessed and diagnosed him annually and provided him mental health services daily. He was supported by a rehabilitation/behavior therapist. A school psychologist conducted a triennial reevaluation, a functional behavior assessment, and an educationally related mental health assessment with social-emotional functioning assessment of [D.O.] [D.O.] had special education and general education teachers observing him daily."

This case is also materially different from cases in which we found that an IEP was not reasonably calculated to

provide educational benefits.    For example, in *N.B.*, where the school district "referred [student's] parents to [an outside entity] for an autism evaluation, rather than arranging for an evaluation after being apprised of [an autism] diagnosis [by an outside expert,]" we held that "it was not possible . . . to develop a plan reasonably calculated to provide [student] with a meaningful educational benefit."    541 F.3d at 1208, 1210.    Unlike the school district in *N.B.*, Escondido assessed D.O. for autism in October 2017 and concluded that D.O.'s eligibility categories for special education should remain unchanged because he did not qualify for special education for autism.

For these reasons, Escondido's delay did not deprive D.O. of educational benefits, and his IEP was reasonably calculated to confer educational benefits.

### 2.    Escondido's delay did not deprive D.O. of educational opportunity[16]

"A loss of an educational opportunity occurs, for example, when there is a 'strong likelihood' that, but for the procedural error, an alternative placement 'would have been better considered.'"    *Timothy O.*, 822 F.3d at 1124 (quoting

---

[16] D.O. argues that Escondido's delay "constitut[ed] a denial of FAPE that caused D.O. a deprivation of educational benefit, loss of educational opportunity, and/or loss of parent participation . . . ."    The district court, however, found that D.O. was denied a FAPE solely "on the basis of the educational benefit ground."    Even though D.O. did not cross-appeal, we may reach the issues that D.O. argues but the district court did not discuss because D.O. is not asking for relief any greater than what the district court already granted.    *See Hilger*, 867 F.2d at 567; *Engleson*, 972 F.2d at 1041; *see also Spurlock v. FBI*, 69 F.3d 1010, 1018 (9th Cir. 1995) ("An appellee who fails to file a cross-appeal cannot attack a judgment with a view towards enlarging his own rights.").

*Doug C.*, 720 F.3d at 1047).    Even though Escondido's autism assessment of D.O. was delayed, D.O.'s special education placement stayed unchanged after the assessment. And there is no evidence that if the assessment had been conducted earlier, an alternative placement would have occurred or been "better considered."    So even if Escondido's delay were a procedural violation of IDEA, such a violation did not deprive D.O. of educational opportunity.

### 3.    Escondido's delay did not seriously infringe on D.O.'s mother's opportunity to participate in the IEP formulation process

A procedural violation constitutes a denial of FAPE if it "seriously infringe[s] [upon] the parents' opportunity to participate in the IEP formulation process."    *Amanda J.*, 267 F.3d at 892.    In *Amanda J.*, the school district withheld reports from the student's parents indicating that the student may be autistic.    We held:

> [B]y failing to disclose Amanda's full records to her parents once they were requested, . . . the District denied Amanda a FAPE.    The IEP team could not create an IEP that addressed Amanda's special needs as an autistic child without knowing that Amanda was autistic. . . . Amanda's parents were not informed of the possibility that their daughter suffered from autism . . . despite the fact that the district's records contained test results indicating as much. Not only were Amanda's parents prevented from participating fully, effectively, and in an informed manner in the development of [her]

> IEP, they were not even aware that an independent psychiatric evaluation was recommended, an evaluation that [her] mother testified she would have had performed immediately.

*Id.* at 894. In *Timothy O.*, where the school district "deliberately refused to include an assessment of . . . autism," 822 F.3d at 1122, we cited *Amanda J.* to find that "this lack of information . . . substantially hindered [the child's] parents' ability to participate in the IEP process." 822 F.3d at 1124–25 (quoting 267 F.3d at 894).

Escondido's delay did not seriously infringe on parental participation. Unlike the school districts in *Timothy O.* and *Amanda J.*, Escondido neither refused to assess D.O. nor withheld any information. It was D.O.'s mother who failed to timely provide Escondido with Dr. Dyson's report. This delayed Escondido in assessing D.O. because "[b]efore performing its own autism assessment of D.O., [Escondido] wanted to review Dr. Dyson's report . . . to identify the specific tests she used because assessors cannot give certain tests more than once within a year." Moreover, even though Escondido proposed an assessment on April 7, 2017, D.O.'s mother failed to consent to an assessment plan until August 2017. Thus, as the ALJ held, Escondido "did not significantly impede parental participation" and "[i]f Mother was impeded in her ability to participate in educational decision-making, it was due to her own delay."

For these reasons, D.O.'s IEP was reasonably calculated to provide educational benefits, and Escondido's delay did not deprive him of educational benefits or opportunity and did not significantly impede parental participation. Thus, even if Escondido's four-month delay in proposing to assess

D.O. were a procedural violation of IDEA, such a violation did not deny D.O. a FAPE.

## D.   Whether Escondido can recoup the $3,500 it paid to D.O. is irrelevant to whether this appeal is moot for lack of a case or controversy

D.O. argues that "this appeal should be dismissed because there is no case or controversy in that the money already paid to D.O.'s parent cannot be recouped by Escondido."   D.O. also argues that "[e]ven if this Court were to find it permissible to reimburse Escondido, its failure to appeal the OAH Remand Order in 90 days should prevent this action from proceeding."   According to D.O., "[i]f Escondido wanted to challenge the cost of the evaluation as a result of the OAH Remand Order [from 2019], it was required to challenge that decision to the district court within 90 days.   Instead, Escondido incorrectly filed an appeal with the [Ninth] Circuit.   Escondido should not now be allowed to ignore the statute and resurrect a fatal decision it made over two years ago."

Even assuming that Escondido cannot recoup the $3,500 reimbursement, that fact would not render the appeal moot. "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings."   *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011).   The issues before us on appeal are whether Escondido's delay in assessing D.O. for autism was a procedural violation of IDEA and whether that delay denied him a FAPE.   These issues are both ongoing and do not turn on the status of the reimbursement.   Thus, whether or not Escondido can recoup the $3,500 reimbursement, this appeal is not moot.

* * *

The district court erred in granting summary judgment to D.O. on his claim that Escondido's four-month delay was a procedural violation of IDEA, and that the violation denied him a FAPE.   We direct the district court to enter judgment in accordance with this opinion.   Each party shall bear its own costs.

**REVERSED AND REMANDED**.

---

SANCHEZ, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's holding that the Escondido Union School District's ("Escondido") delay in proposing to assess D.O. for autism did not deny him a Free Appropriate Public Education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA").   I respectfully dissent, however, from the majority's conclusion that Escondido's failure to act for four months in the middle of the school year was nonetheless reasonable under the IDEA because D.O.'s mother was uncooperative.   Our precedent is clear that the school district has an independent legal obligation to promptly assess a child for a suspected disability, even when the parent does not cooperate in full or makes promises they do not keep.   Accordingly, I would affirm the district court's determination that Escondido's four-month delay in initiating the process to assess D.O. for autism constituted a procedural violation of IDEA, and reverse its determination that this procedural violation resulted in the denial of a FAPE.

## I.

The material facts are not in dispute.    On December 5, 2016, Escondido was made aware that Dr. Margaret Dyson, a licensed clinical psychologist at Rady Children's Hospital, had assessed D.O. and determined that he appeared to meet the criteria for autism spectrum disorder.    The parties agree that Escondido's duty under IDEA to propose an assessment plan for D.O. was trigged by this disclosure.    It is also undisputed that Escondido did not propose to assess D.O for autism until April 7, 2017—a four-month delay equivalent to half the school year.    The district court found that Escondido made "minimal attempts" to obtain the Dyson report over those four months and only proposed an assessment plan after D.O.'s mother filed a due process complaint against the district on March 28, 2017.    The court further found that Escondido's delay was motivated at least in part by staff skepticism about the autism diagnosis.[1] Finally, there is no dispute that when Escondido finally proposed its assessment plan, district staff had not received the Dyson report and did not rely on any outside report to prepare the assessment plan.

The majority's holding that no procedural violation occurred here         contravenes our precedent and the

---

[1] The district court's findings concerning staff members' actions or inactions and what motivated their decision to delay the assessment plan are factual findings we review for "clear error even when they are based on the written record of administrative proceedings." *See Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.,* 267 F.3d 877, 887 (9th Cir. 2001).    Whether staff had reasonable grounds for the delay and whether such delay constituted a procedural violation of IDEA are questions of law we review de novo.    *See id.*    As discussed below, the majority muddles this distinction and fails to accord appropriate deference to the district court's factual findings.

procedural requirements of IDEA. Under federal law, the district must ensure that "[each] child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B); Cal. Educ. Code § 56320(f); *see W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir. 1992) ("State standards that are not inconsistent with federal standards [under IDEA] are also enforceable in federal court."). A child is "suspected" of a disability "when the district has notice that the child has displayed symptoms of that disability." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016). "Once either the school district or the parents suspect disability … a test must be performed so that parents can receive notification of, and have the opportunity to contest, conclusions regarding their child." *Id*. at 1120 (internal quotation marks and citation omitted). IDEA "requires that [school] districts act within a reasonable time to evaluate potentially disabled children." *JG v. Douglas Cnty Sch. Dist.*, 552 F.3d 786, 798 (9th Cir. 2008).

We have consistently held that inaction by parents does not relieve districts of their independent obligation to comply with the procedures established by IDEA. In *W.G. v. Board of Trustees*, for example, a child's parents promised the school district they would arrange for personnel of the child's school to attend an IEP meeting for the child, but the parents failed to do so. 960 F.2d at 1481. We held that this failure did not relieve the school district of its own duty under IDEA to secure the school's participation in the IEP meeting. *Id.* at 1484–85; *see also id.* at 1486 (finding the school's failure to propose a follow-up IEP meeting for five months during the school year was a procedural violation of IDEA). In *Union High School District v. Smith*, we rejected the argument that parents who withheld portions of

an outside report diagnosing their child with autism excused the district of its obligation to evaluate the child for autism. 15 F.3d 1519, 1523 (9th Cir. 1994).   We concluded that even if the withheld portions of the report were relevant to such evaluation, "[a]ny failure of the [parents] to turn over portions of a specialist's report cannot excuse [a district's] failure to procure the same information for itself."   *Id.* at 1523–24 (citing *W.G.*, 960 F.2d at 1484–85).

We reiterated again in *N.B. v. Hellgate Elementary School District* that "[a] school district cannot abdicate its affirmative duties under the IDEA."   541 F.3d 1202, 1209 (9th Cir. 2008).   In *N.B.*, the district was alerted to an outside report diagnosing the child with possible autism. *Id.* at 1205–06.   Because the district did not have personnel qualified to conduct an autism evaluation, it referred the parents to an outside organization that provided free autism testing.   *Id*. at 1208–09.   The child's parents did not procure an evaluation from the outside organization for several more months, and the district seized on this fact to argue that the parents' inaction excused its own failure to secure an evaluation.   *Id.*   We rejected the argument, holding that the district "did not fulfill its statutory obligations by simply referring [the child's] parents to the [outside organization].   Such an action does not 'ensure that the child is assessed,' as required by 20 U.S.C. § 1414(b)(3)(C)."   *Id*.

D.O.'s mother's failure to provide the Dyson report to the district does not excuse Escondido's statutory obligation to propose an assessment plan for D.O. within a reasonable period after becoming aware of his suspected disability.   It makes no difference that D.O.'s mother promised to deliver a copy of the Dyson report to Escondido on December 5, 2016, because Escondido could not abdicate its own

affirmative obligation to begin the autism assessment process under IDEA. The majority emphasizes that Escondido could not assess D.O. without first knowing which tests Dr. Dyson used to evaluate D.O. because certain autism tests cannot be administered to a child more than once a year. Even if true, that does not bear on the procedural violation at issue in this appeal. The challenged delay here concerns Escondido's "minimal attempts" to procure the Dyson report and its failure to propose an assessment plan for four months of the school year, not a delay in the assessment itself. Escondido's justification for failing to act sooner—that it was waiting on D.O.'s mother to deliver the Dyson report—rings hollow given that district staff had not obtained and did not rely on the Dyson report when they proposed the assessment plan in April 2017.

The majority contends that the district court clearly erred in its "minimal attempts" finding because Escondido asked for the report twice, first in December 2016 and then again in April 2017, and it quibbles over whether this is a factual finding or mere characterization. This *is* a factual finding, and it is amply supported by the record. Escondido provided no evidence it made any effort to obtain the Dyson report over those four months, nor does it challenge the court's finding that the district only offered an assessment plan *after* D.O.'s mother filed a due process complaint on March 28, 2017. This timing indicated to the district court that litigation was what prompted the district to act. Indeed, in the administrative proceedings below, Escondido argued that district staff "did not immediately seek to begin their own autism assessment because they believed there was the possibility that the final [Dyson] report would state [D.O.] did not meet diagnostic criteria for autism spectrum disorder." The ALJ found this reason for delaying

assessment "specious," both because Dr. Dyson stated on December 5, 2016 that her report had been finalized and because district officials were unlikely to accept the report. The district court's factual finding that Escondido made "minimal attempts" to begin the autism assessment process was not clearly erroneous.

As the district court also found, Escondido delayed in part because district staff were skeptical of Dr. Dyson's autism diagnosis. Our precedent does not permit a school district to refuse to undertake a formal assessment of a child because district staff are skeptical that the child will be diagnosed with the disability at issue. In *Pasatiempo v. Aizawa*, we held that the informed suspicions of parents trigger the duty to assess, even if the district disagrees with those suspicions. 103 F.3d 796, 802 (9th Cir. 1996). In *N.B.,* we held that the informed suspicions of outside experts do the same. 541 F.3d at 1208–09. In *Timothy O.*, the district was aware that the child displayed signs of autistic behavior but declined to formally assess him for autism "because a member of its staff opined, after an informal, unscientific observation of the child, that [he] merely had an expressive language delay, not a disorder on the autism spectrum." 822 F.3d at 1109. We held that the district's failure to formally assess the child for autism was a procedural violation of IDEA, concluding that "if a school district is on notice that a child may have a particular disorder, it *must* assess that child for that disorder, regardless of the subjective views of its staff members concerning the likely outcome of such an assessment." *Id.* at 1121.

The majority attempts to distinguish *Timothy O.* by suggesting that Escondido staff had a more substantial basis for its skepticism of the autism diagnosis. Unlike the cursory "thirty to forty minute[]" informal evaluation by the

psychologist in *Timothy O.*, the majority reasons, Escondido has educated D.O. since the summer before kindergarten and has provided D.O with mental health services for five years. Interactions by several mental health and medical staff gave Escondido a far more substantial and "scientific" basis for its skepticism of the autism diagnosis, the majority concludes.   The majority therefore determines that the district court erred in attributing Escondido's delay to the subjective views of its staff.   The district court's factual finding was not clearly erroneous.   No authority supports the proposition hinted at by the majority that a school district can delay or refuse a formal assessment if district staff have interacted more frequently with the child or provided mental health services in other areas of need.   Not even Escondido argues that its staffs' interactions with and observations of D.O. served as an adequate substitute for a formal assessment of D.O. for autism.

Under IDEA and state law implementing its requirements, the school district must ensure that "the child is assessed in *all* areas of suspected disability."   20 U.S.C. § 1414(b)(3)(B) (emphasis added); 34 C.F.R § 300.304; Cal. Educ. Code § 56320(f).   The majority invents a caveat to this directive that does not exist in statute or caselaw.   As we explained in *Timothy O.*:

To hold that [district staff's] informal observation could overcome [Escondido's] statutory obligation to *formally* assess [D.O.] for a suspected disability would allow school districts to disregard expressed and informal concerns about a child's disabilities on the basis of prejudicial stereotypes about what certain disabilities look like, *rather than on the objective evidence and the thorough and reliable standardized testing that the IDEA requires*.

*See* 822 F.3d at 2016 (emphasis added).    Common sense also supports requiring a district to formally assess a child for a suspected disability even when skepticism about the resulting diagnosis is well-grounded: The formal assessment will determine these matters conclusively and clarify for the parents and school district alike the appropriate next steps to support the child.

Finally, the majority's reliance on *JG v. Douglas County School District* is misplaced.    In *JG*, the school district was required under 20 U.S.C. § 1415(b)(3) to provide the parents of twins with notice of a proposal to evaluate the twins for learning disabilities by May 7, 2003, but the district failed to do so.    552 F.3d at 789.    Unaware that the district would conduct evaluations, the twins' parents sought and paid for private evaluations.    *Id.* at 795.    Recognizing that the school district denied the children a FAPE when it did not provide the parents with notice of a proposal to evaluate on May 7, 2003, we held they were entitled to full reimbursement for the private evaluations.    *Id.* at 792, 795.

We also considered whether the evaluations ultimately conducted by the district occurred within a reasonable time. *Id.* at 795–99.    The school district conducted general evaluations on August 25, 2003—110 days after notice to the parents was due on May 7, 2003.    *Id.* at 796, 798.    The earliest the district had any notice of suspected *autism* was on July 28, 2003.    *Id.* at 789.    On September 25, 2003, the district began autism-specific testing—just 59 days after becoming aware of the twins' suspected autism.    *Id.*    In concluding that the district's autism testing was not unreasonably delayed, we emphasized two points.    First, summer vacation took up part of the delay from May to late August, which impacted only 38 school days.    *Id.* at 798–

99.   Second, initial general evaluations of the twins were conducted over a month before autism-specific testing began in order to build the "trust and comfort level between child and evaluator" required for effective autism testing.   *Id.*

The majority analogizes the reasonable "110-day delay" in *JG* to the 123 days it took Escondido to propose an assessment plan for D.O.   The comparison is inapt because the 123 day-delay in this case was *during the school year*, not over summer vacation, and therefore the delay occurred over 73 school days—almost double the number of school days impacted under *JG*.   More importantly, it took the district in *JG* just 59 days from becoming aware of the twins' suspected autism to begin autism testing.   *See id.* at 789. Conversely, it took Escondido 123 days from becoming aware of D.O.'s suspected autism *to even propose* an autism assessment plan.   Nor are Escondido's minimal efforts over a four-month period of inactivity at all comparable to the month-long general evaluations conducted by the school district in *JG*, which were "essential to produce valid test results" when autism-specific testing began.   *See id.* at 798.

With the goal of guaranteeing a free appropriate public education to all children with disabilities, IDEA requires a school district to timely evaluate all potentially disabled children.   *Id.* at 797–98; *see N.B.*, 541 F.3d at 1207.   The statute does not leave it to the district to decide when to assess for a disability and when not to bother.   Notice of a suspected disability automatically triggers the district's obligation to assess "using the comprehensive and reliable methods that [] IDEA requires."   *Timothy O.*, 822 F.3d at 1121–22; *see N.B.*, 541 F.3d at 1207.   To hold otherwise "would be particularly devastating for children with autism," which can manifest in varied and non-obvious ways.

*Timothy O.*, 822 F.3d at 1121.    Here, I can see no reason to disturb the finding that Escondido's unjustified four-month delay in initiating an autism assessment of D.O. was a procedural violation of IDEA.

## II.

I concur in the majority's conclusion that Escondido did not deny D.O. a FAPE but write separately to explain the differences in my reasoning.    Procedural violations deny a child a FAPE where they "result in the loss of educational opportunity" or educational benefits, or where they "seriously infringe the parents' opportunity to participate in the IEP formulation process."    *Amanda J.*, 267 F.3d at 890 (quoting *W.G.*, 960 F.2d at 1484).    Escondido's procedural violation had no such effect, and D.O.'s IEP was "reasonably calculated to enable [D.O.] to receive educational benefits," as IDEA requires.    *See Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1054 (9th Cir. 2012) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 (1982)).    As the majority explains, Escondido's delay in initiating the autism assessment process did not deprive D.O. of educational opportunities or benefits.    D.O.'s October 2017 evaluation established that he did not qualify for special education for autism and D.O.'s special education placement remained unchanged.    In other words, Escondido would not have provided D.O. different educational opportunities or benefits had it initiated the evaluation in a timely manner, because the results of the evaluation indicated that no change in D.O.'s education was required.

However, the majority misses the mark when it attempts to distinguish the instant case from *Timothy O.* and *N.B.* by positing that "the *refusal* to assess" differs from Escondido's

"*delay* in assessment."    In determining whether a school district's failure to timely assess a child denied the child a FAPE, the relevant question is what impact such failure had on the child's education, not whether the failure is better described as a "refusal" or a "delay."    *See Timothy O.*, 822 F.3d at 1118; *JG*, 552 F.3d at 789; *N.B.*, 541 F.3d at 1207. Where a district's delay in initiating a disability assessment is sufficiently long, there is no functional difference between an unreasonable delay and a refusal to assess.    Both result in the failure to provide a timely assessment and may deprive the child of educational opportunities or benefits guaranteed by IDEA.

*Timothy O.* is distinguishable not because of the district's refusal to conduct an assessment, but because there was "strong reason" to believe the district would have provided the child different educational opportunities had the district formally assessed the child for autism.    822 F.3d at 1124–25.    Similarly, in *N.B.*, the district failed to obtain a timely autism evaluation of the child, eventually receiving a report from an outside center indicating the child had autism.    541 F.3d at 1206.    In response to the report, the district made substantial changes to the child's IEP, four months after it was first put on notice of the child's potential autism.    *Id.* at 1206, 1208, 1210.    The salient point of these authorities is that the failure to conduct a timely assessment resulted in the denial of a FAPE because the children were unable to receive an IEP properly tailored to their individualized needs and supportive services.    Here, by contrast, the record shows that Escondido's delay in initiating D.O.'s assessment had no impact on D.O.'s IEP or the education D.O. received.

Finally, I concur with the majority that Escondido's delay did not deny D.O.'s mother the "ability to participate in the development of [his] IEP in an informed and effective

manner." *See Amanda J.*, 267 F.3d at 890–91.  Escondido did not deprive D.O.'s mother of any evaluative information about D.O., conduct we have held impairs parental participation.  *See id.*; *Timothy O.*, 822 F.3d at 1124–27. Further, once Escondido proposed an autism assessment plan, D.O.'s mother did not participate in the assessment process for several more months.  As the majority notes, she waited until July 2017 to consent to the plan.

However, the majority's analysis of whether Escondido seriously infringed on parental participation emphasizes again that Escondido did not refuse to assess D.O., posing the wrong question. The relevant question in my view is whether Escondido's delay in proposing an assessment plan denied D.O.'s mother the ability to meaningfully participate in the development of D.O.'s IEP.   It did not.   There is no evidence that Escondido failed to offer D.O. "an IEP reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).   In sum, Escondido fell short of IDEA's procedural requirements, but did not deny D.O. a FAPE.